I was before it, two cases being submitted later today on the briefs without oral argument. Those are Appeal 3192 from 2008, Mays v. Merit System Protection Board and Appeal 3316 from 2008, Crawley v. the Office of Personnel Management. On our argument list, we'll hear argument first in Appeal 1187 from the current year, NMB Singapore v. United States. Ms. Kayaza, good morning to you. Welcome to the court. Please proceed. Thank you, Your Honor. I would like to reserve three minutes of my time for rebuttal, if that's possible. That's fine, and we'll need you to speak up very firmly so we don't miss a word. Absolutely, and I'll also be limiting my remarks today to JTIC's appeal and Breston R. Brees with respect to our opposition to Timpkin's appeal. JTIC's appeal is about the department's evaluation of post-order import volume in a sunset review determination in which the department cited contradictory evidence and made conflicting statements about that evidence. But at the outset, let me be clear what our appeal is not about. We are not asking this court to re-weigh that evidence or to second-guess the department's judgment about it. Rather, what we are asking is for the court to remand the determination so that the department may explain its judgment about the post-order import volume evidence as it should have done in the first instance. The department's failure in the final results to explain this data and to address JTIC's arguments, which seriously called into question the department's preliminary evaluation of that data, makes the department's decision in the final results, its decisional path, impossible to follow with respect to its evaluation of post-order import volume. So you're not saying that the Commerce Department determination was necessarily wrong? You're simply saying that it's so opaque it could be unreviewable and on that basis alone requires a remand? Yes, Your Honor, because the part of the department's decision that was so opaque went to a critical statutory factor that the department is required to consider. In a sunset review, the department must consider two factors. Well, I take it you're not conceding that their result was correct? No, we do not. But we believe that the department needs to explain its analysis to understand how it got to the point that it could say that post-order import volume had decreased substantially. What do you do with all of the case law that says we don't sit to review opinions, but only judgments or administrative agency final determinations? I would look to this court's precedent, specifically the Timken opinion that we cite in our briefs. There the court was looking at the statutory provision that we cite, which is subsection I of section 1677F of the anti-dumping statute. And there the court did make clear that the court will not remand a decision simply because the department failed to address an argument by a party. But the court said that it is important for the department to address important aspects of a statutory factor and that it would be appropriate to remand in such an instance. So here we have a situation similar to what was being described in Timken where a party pointed out to the department that its analysis with respect to a critical statutory factor overlooked a very important aspect of that factor. And the department failed to acknowledge this argument or to explain in any way why the fact that JTEC pointed out was irrelevant or not critical to its decision. Well, what's the difference between that and not meeting every argument presented? It's definitely a fine line and it's a question for the court to determine. I mean, not every argument is going to be so critical, but the courts have drawn that line in the past. So for example, in the Altex case, which was decided by the CIT and affirmed by this court, the Court of International Trade looked at a decision by the International Trade Commission and decided that this commission simply had not addressed the party argument that it seemed critical to the outcome and remanded for additional explanation. And that outcome was affirmed by this court. So there are instances, and admittedly it's a question of line drawing, but where an argument goes to a critical statutory factor, and we do not understand, we cannot understand from the department's determination how it arrived that it's a factual finding with respect to that factor, that's a situation that is appropriate for remand under this court's decision in Timken. Well, if Timken requires vacater or reversal in remand, then obviously you'll win just based on Timken. But maybe we should assume for sake of argument that we aren't persuaded that Timken's piece is your case, so to speak. It's not clear to me exactly what you're maintaining in terms of an erroneous determination. The department in the preliminary... Let me rephrase the question. We have a lot of case law that says if the record is adequate to support the determination, then ordinarily we should affirm, even if the opinion is pitiful, as long as the evidence itself, I suppose we should maybe add in the absence of some legal error, but if it's a fact-driven determination and it's poorly explained by the commerce text, but the evidence in the record looks ample, then according to my sense of that case law, in that circumstance we should affirm. Why is this then not such a case? Because the evidence in this case is not ample to support the statement made by the department in its preliminary results. In the preliminary results, the department stated that post-order import weight and value decreased substantially. That is the specific statement made by the department. In its case brief, JTEC pointed out to the department that in fact the very evidence cited by the department in the preliminary results showed that post-order import value on average decreased by 25% during the sunset review period. It did not, I'm sorry, it increased by 25%. It did not decrease substantially as contended by the department. When you talk about 25%, you're comparing exactly what with what? We are comparing the two years prior to the order in position with the five-year sunset review period on average. A five-year average versus a two-year average? Which is the data that is available on the record for the pre-order period. I'm just curious, doesn't the, as I understand it though, that the factors are volume of imports. That's true. I mean, that's what, I mean, let me ask it this way. Don't we have to in the first instance look to see whether commerce's conclusion with respect to volume of imports is supported by substantial... And that is exactly the factor that we are asking the court to look at. We see a record, we wouldn't have to look to value. Well, I disagree, Your Honor, because the department in its regulations has identified the factors that it looks at to determine pre- and post-order volume. And in its regulations, which is 19 CFR 351.218 D3, the department requests parties to provide information as to weight and value, which it then uses to analyze volume. And that's critical because the statute requires the department to look at volume, but it does not tell the department the measure that the department must use to figure out what volume is. It could be weight in some instances, but perhaps it might be more appropriate to use volume. Let me ask you, what is your complaint or concern with respect to the volume? Just looking at the volume side of the equation. Our concern is the following. The department stated that the volume decreased substantially as to both weight and value. With respect to value, that did not occur. The average value of post-order imports increased by an average of 25%. With respect to weight, it only decreased by an average 10%. In our view, that is not a substantial decrease. Particularly with respect to value. That statement by the department is unsupported by the evidence, and it does not explain how it can make that argument, how it can make that statement when JTEC has pointed out to the department the errors in that statement. There's no explanation of how the department can maintain that factual finding or why it doesn't need to rehabilitate it in light of JTEC's arguments. You can rest assured that your two minutes of reserved rebuttal time will remain intact. Help me understand what you're really saying here. It sounds to me like you might be saying that under some unsighted case law, a change, a percentage change would have to meet some kind of metric to merit the label substantial. Is that right? Am I following you? We're asking that the department be required to explain how a percentage decrease by only the fact that the value increased and did not decline as the department had indicated. The department used the word decrease. Are you suggesting that 10% is some kind of magic line in the sand and that it would have to be 20 or more percent? It is not appropriate for us to draw the line. It's for the department to draw the line. But in the statement that it made that volume decreased substantially, the value clearly was contradicted by the evidence. With respect to weight, we contend that 10% is not so obviously a substantial decrease that the department can simply rest on that and not explain how its factual finding survives our challenge. Putting aside what they explain or don't explain for a moment, I still don't quite understand what the problem is other than you don't think 10% is substantial. Then you admit that that's kind of a matter of a judgment call or a matter of opinion or all sorts of people might disagree. Maybe I would think it should be 20% and Judge Schall would think it should be 5% before it can be called substantial. But isn't that the sort of close call weighing decision that arguably is best left to the presumably expert economists and trade lawyers and other workers in the International Trade Administration? Absolutely, Your Honor. But the department, it's incumbent upon the department to explain where it draws the line. And the department has not done that here. And I think that in particular, where an interested party has pointed out that there is another way to look at the evidence that demonstrates that the decline identified by the department really is not substantial and perhaps is better attributed to market factors such as a recession or just whatever is going on in the industry. Causation is elusive. Well, is it also part of your argument that they needed to look at both these metrics whereas they seem to be relying on one rather than both? The department relied on both metrics in the preliminary results. That is a statement in the preliminary results. We are asking that the department be held to that statement, that it explain how that statement could possibly be true in light of the challenges that JTEC presented in its case brief. We're simply asking that the department be held to its statement. Well, is it inherent in your argument that those two metrics have to be given equal weight in the final assessment? No, Your Honor. That would be for the department to decide. So if one factor could be given 90% weight and the other factor only 10% weight, might the results here not be justified? It is entirely possible, but we simply have no way of knowing how the department evaluated the data because it did not explain its determination. Wouldn't we have to assume, being somewhat logical people hopefully, that they must have given overwhelming weight to the factor that supports their decision and little or no weight to the contrary factor that obviously couldn't support their decision? Well, respectfully, Your Honor, we have to look at the decision as it appears, as it was issued by the department, and the court must... Well, Your Honor, that's not quite true. There's a lot of case laws saying that we have some obligation as a reviewing court to apply logic and to look at the record and to assess the evidence in light of what the Commerce Department in this case or a jury in a patent infringement case, for example, could have relied on because it might be adequate and it's in the record. Well, Your Honor, respectfully, the department is required to look at pre- and post-order import value and margins in its analysis under the statute. Explicitly? Explicitly. It has to discuss it? It absolutely must address those two factors. In every case? Yes. In every Sunset Review determination, the statute requires the department to provide an analysis of those two factors. And our point is simply that there is no analysis... But those two factors, as I understand it, are simply proxies for a third factor. I'm sorry, what is that third factor? Well, I thought that was your whole point. No, the statutory framework is that the department has to consider two pieces of information, has to perform two analyses. It must look at pre- and post-order import volume and it must look at dumping margins. Our problem with the department's decision is with respect to the first factor and specifically post-order import volume. Right. And the concern is that that wasn't discussed at all in the final determination? That is correct. And what's interesting is that in the final determination, with respect to the likelihood of the dumping continuing or recurring, that is not discussed at all. But in the separate section that has to do with the margin likely to prevail, the department makes the statement that subject imports remained at a steady level during the Sunset Review period. The department nowhere explains how subject imports, the same subject imports, could both decrease substantially, as it found in the preliminary results, and remain at a steady level, as it found in the final result. That's a conflicting statement the department made. But you're happy with that result? With respect to the margin. We believe that that is the result that's supported by substantial evidence. But regardless... Ms. Kaza, I understand that the volume import figure is based on the documented 199 of the joint appendix, right? I mean, these are the Japanese trade statistics. That is the weight data, correct. Right. Do you have a problem with that? I mean, the evidence is what it is. I mean, that is the evidence in the record, with respect to weight. If you look at that evidence, it does seem to provide substantial evidence to support the determination of commerce, at least on this volume issue. With respect to weight, it does demonstrate that there was a perceptible decrease in the content, but not enough to support a finding of a substantial decrease. And the department used the word substantial. We don't know if the department had found just somewhat of a decrease, if it would have reached the same result. Perhaps somewhat of a decrease could be attributable to normal market noise. But the department used the word substantial, and we have to hold the department to the words that it chose in this case. And our contention is that this weight data does not show a substantial decrease. And certainly, with respect to value, there was not a substantial decrease. All right. Thank you. Let's hear from the government on the other side. Who's going first? Mr. Salomon. That's right. A little confusing who's sitting at what table in this particular case. We almost need a third table. Good morning to you. Please proceed. Thank you, Your Honor. May it please the court, I'll proceed with the magnitude of the margin issue. In a sunset review, the Commerce Department has to determine the likelihood of continued dumping should an order be revoked. That determination is affirmative. That must estimate the magnitude of the margin of dumping that each responding company that's being examined or reviewed is likely to prevail. Under the statute and its accompanying statement of administrative action, the department's beginning presumption is that the likely dumping margin upon revocation is the margin determined in the original investigation.  Under certain out of the ordinary circumstances, the department may select a more recent margin as a more accurate measure of likely dumping. In this case, Commerce selected more recent margins for three Japanese ball bearing producers. We are here before this court because those selections are not supported by substantial evidence and are contrary to law. The evidence in the record actually contradicts Commerce's finding. Further, Commerce departed without explanation from prior agency practice by failing to compare each respondent's post-order import volumes with their pre-order import volumes and by examining each respondent's share of total exports from Japan rather than their share of apparent US consumption of ball bearings. Anywhere in the record, is there any clue about why they switched their method? None, because in the preliminary results, Commerce, in fact, said they were going to use the margins from the original investigation because those were calculated without an order in place and thus represented where the most representative will be likely to occur with the order to be revoked. Counsel, I understand your argument in page 188. It's hard for me to look at that and appreciate that that shows that both of them are staying the same, two of the three at least. You can't even argue from 188 stay the same or increase, it seems to me. And I also appreciate your argument to be that 188 isn't even a proper measure for these purposes because it's only looking at percentage of Japanese imports into the US. Well, if as a result of this dumping order, they were originally selling a million a year pre-order and as a result of the dumping order, now they're selling 10 a year, the fact that you're still selling 10% doesn't mean your volume has stayed the same or increased. That's precisely correct. I have all of that and I have it well in hand, but what I don't understand is your notion that for purposes of changing the margin, when we've already decided a margin must still exist, why do you say they should be looking at pre-order and post-order numbers rather than numbers over the life of the order itself? Because the statement of administrative action specifically says that normally commerce, it's the intention of the administration, that normally commerce would select- Show me where in the SAA exactly you think for with regard to this point, I certainly understand for the overall point of whether or not a margin ought to exist at all. Commerce looks to pre and post-order volumes, but I don't understand why in determining what margin ought to apply when they've decided a margin ought to exist, why they should be looking at pre and post. Well, we would maintain- Because I didn't see it in the SAA. The SAA doesn't specifically, it is correct, the SAA does not specifically direct commerce to compare pre and post-order- And their statements have been, as far as I understand, looking at only the issues in this case and what you've presented, but it seems to me their statements have always been consistent on this point, that they look at them over the life of the order. Actually, to disagree with that, Your Honor, we cite a number of cases beginning at page- Which brief are you going to- Our principal brief from May 30th. Beginning at page 21, we cite a number of sunset determinations where in the discussion of the magnitude of the margin, commerce specifically said that it was looking at each respondent's pre and post-order import volumes, and that goes to our second point. But that's for purposes of determining, are you sure that's for purposes of determining the magnitude of a margin- Yes, that's absolutely- We've already decided a margin ought to apply, and here's my next question, which is, why can't, if that's, yes, I'm assuming your answer is yes to that one? Yes, that's correct. Yeah, okay. So then, but why can't commerce decide to just look at the margin over the life of the order? It seems to me the pre-order volumes are somewhat irrelevant to, once we decide a margin has to apply, what exactly number is the appropriate number, because it seems like you can look at what occurred over the life of it, and that seems eminently reasonable to me to do it that way. So why ought I to reverse something that it seems, even if I agree with you on the evidence, I'm just trying to think of, if I were to craft a remand order, for example, what would I tell commerce to look at? I'm not sure that I feel that what they've done in this regard is somehow unreasonable or inappropriate, so tell me why I need to tell them, no, no, you can't just look over the life of the order, you have to look over both. They have a lot of discretion, don't they? They do have discretion, but that discretion is not unfettered, and when you have sunset determination spanning over a decade, where the language is, where there is no company specific data indicating that a respondent with a lower or de minimis margin maintained pre-order sales levels, the department will provide the ITC with the rate from the original investigation, and that's from Honey from Argentina and China, and a similar language appears in one review, after review, after review, including in the first sunset review of this very same order back in 1999. They said in AFBs from Japan- I guess I don't understand why this is relevant to the issue of what the margin, I guess I'm really not even appreciating your argument, so help again. The logic begins with the statement of administrative action, where while it does not direct commerce to compare pre- and post-order import bonds, what it does say is that you're normally going to go with the original margin, because that reflected what the behavior- I don't think they disagree with you, that that's normal. I understood their brief to agree that that's what the SAA says, and normally they do, and the question is, what do we do when normal doesn't apply? But behavior has two aspects to it, what level of dumping and what level of sales, and commerce itself has said, when it prefers to- I'm into my rebuttal time- commerce itself has said that- I'll go back to pure magnesium from Canada, where the respondent specifically asked commerce, don't use our pre-order import bonds, because those aren't really relevant to how we behave today. Use as your benchmark the import bonds from a year covered by the review. Why is it inappropriate for commerce to determine what is the appropriate time period to look at? It just seems like that is a matter of such discretion that I really am troubled by the notion that because they did, in some other case, decide it was appropriate to look, maybe it wasn't as long a period of time as it was here. There are a million different factors, it seems to me, could weigh into commerce's determination to look at this number of years versus that number of years, and it's hard for me to think that I am better suited than them to come along and change that. Because, again, in pure magnesium, commerce in response to that argument said, we can't use import volumes from a year covered by the order. It's not appropriate for any purpose, because what your import volumes were when the order was in effect is not going to be probative of what you're going to do if you remove the order. What's probative is what were they doing when there was no order in place, and whether there will be an effort to... But they're not questioning whether to remove the order here. Everyone agrees, well, no, I mean, everyone doesn't agree, but for purposes of your cross appeal, the issue exists, the order would stay in place, and the question is, what should the magnitude be? So, you're framing it in terms of a totally different issue. I should let you keep some of your bottle time. I don't want you not to get a chance to respond. Go ahead. Well, I would go to then the point that if that is what commerce thought was appropriate to do, it had an obligation to explain that in this review. It went contrary to 10 years of practice in other sunset determinations, where it compared expressly pre-imposed order import bonds. If there was some reason... Okay, I understand. With my colleagues indulgence, just one last question. So, if I disagree with you on this argument and decide it's commerce's discretion over what period they're going to look, you would still tell me I still have to remand because there still is a question of, even if you're just looking over the five year period when the order was in place, there's still very much a question about whether they decreased or increased. That is certainly true. Okay, that's all. I just wanted to make sure your ultimate position was remand, if that was the case. Yes. Got it. Your rebuttal time will be restored. Now, I'll hear from the government. Thank you, Your Honor. May it please the court. The Commerce Department believes that the finding that dumping is likely to continue if the order were remanded should be affirmed. Your Honor's already pointed to the record at page 199 of the joint appendix, the import volume by weight in kilograms. I'd like to point out that the Commerce Department looked at 1989, which was the year the order was issued, and 1988, which was the year immediately prior to the order. If you look at the volume in those years, the import volume has not attained those levels during the 15 years of review in this order. That is the substantial evidence supporting the Commerce Department's determination that there has been a substantial decline in the import volume. Do you mind if I ask you about the cross appeal? Certainly, Your Honor. If I'm taking you too far off, you can spend as much time as you want on the appeal. Okay, so where is the substantial evidence to support the determination that COYO, NSK, and NTN's import volumes over the five year life of the order are, in fact, staying the same or going up? The only things you point to seem to me to go the opposite way. JA-188, for example, is a source of what it seems to me the government, the Commerce Department, and the CIT all rely upon. The position that it would be okay for Commerce for NTN to look at year 2000 and 2003, well, how does that work for COYO, and how does that actually work for NSK? Because if we're going to choose the years 2000 and 2003 and cherry pick only those years, it seems like we ought to be doing the identical thing for the other parties. So then, maybe I'd agree with you. You've proven it for NTN, but now you've failed to prove it for NSK and COYO. It doesn't seem to me that you can pick any two years or any subset of these five years in any way and justify a substantially staying the same or increasing for all three of these companies. So, tell me how to get there. Certainly, Your Honor. If you look at attachments... I believe it's the... Yes, 196 was the COYO data, 194 was the NSK data, and I believe 191 was the NTN data. I don't have so much of a problem with the NSK fact finding, but why don't you tell me either COYO or NTN and show me on either of those two documents how I ought to conclude that commerce is finding in this regard is supported by substantial evidence. And the NSK is at 194 and the COYO is at 196, correct? COYO is at 196, yes, Your Honor. If you want to start with 191, just go first in order and show me how this is NTN, 191 and 192. Show me what data on these tables supports the notion that import volumes have remained the same or gone up over the life of the order. I believe they were the Commerce Department cited to the finished product, which is... Well, that's not what their table on 188 cites to. On 188, it's the combination of the finished product plus the part. So, if you want to just work on the finished product, that's fine, but we're going to work on the finished products for all three. You're not going to get to cherry pick. Finished products for NTN, parts without finished products for the other. Do you understand? It's the same thing with your... I understand, Your Honor. I believe there was a problem, though, that for one of the producers, the finished products plus parts was not available, and therefore they used the finished... I thought I saw it for all three. Okay, you want to look at just finished parts then? I believe that's what the Commerce Department did, and I'm trying to find the site in the US, Your Honor. That would be useful because this order covers both finished products and parts, right? So, we have the numbers for both. For the other two companies, so even if one of the companies was deficient in providing the numbers, wouldn't the best approach be to use the numbers that represent the scope of the actual order for the two companies that provided it? Let's see. I'm sorry, Your Honor. It was NSK that used only finished parts, and that's at page 181. For NTN, they used the total, and I guess they're down at the... Sure. So, the NTN on page 191... Yes, if you look at it, it looks like there's a little arrow in the left. Okay. Okay. Okay. Your Honor, and for Koyoseco, I believe the reference... The reference was to the market share of imports since the issuance of the order, and it shows some variability from 8.9% down with some fluctuation, but if you exclude the first year, it was relatively operating within a relatively stable band. So, for Koyoseco, you're looking on page 196, I understand, correct? 1996. Yes, Your Honor. Okay, at the total, which is the bottom. Okay, and then for NTN, they looked at total of finished... I thought... I was pretty sure the Commerce had looked at totals. I mean it... They... I apologize, Your Honor. They don't specify here. For NSK and NTN, they specify for here. They didn't specify which they were looking at. Maybe a remand might be in order. Well, Your Honor, I think there's still substantial evidence to support the... Where? We just... Well, Your Honor, I believe what they're looking at is if you look at page 181... Mr. DelSanto, let me ask you, your colloquy with Judge Moore does seem to highlight one thing. That the cases do seem to say that you have to be able to discern the path that Commerce took. Yes. That seems to be the law. And this colloquy, at least to me, that you've had with Judge Moore, suggests that it's difficult to discern. I mean, you've had to... She's asked some questions. You've had to go back and forth. She's come back with a response. And you've said, well, you know, it seems that it is difficult to discern the path that was taken, at least on the basis of the decisional record that's before us now. I mean, just from what's happened here in court, we seem to be sort of groping around a little bit. A bit, Your Honor. However, on page 181, the Commerce Department does include here in the text that the dumping margins calculated during the period of review and notes that there is an overall trend of declining dumping margins. Well, I don't think there's any, in terms of the margin issue, I mean, that doesn't seem to be an issue. I mean, it's the second part of this equation on margin, namely, and that you had volume or import levels staying the same or increasing. That's been the focus of the discussion. Yes, Your Honor. Where there seems to be a difficulty in following the path. I would still argue, Your Honor, that it's reasonably discernible, given the evidence showing the overall decline in the dumping margins. Additionally, the Commerce Department, by statute, has the authority to report a more recently calculated dumping margin. It's within their discretion. Yeah, but doesn't the SAA say on the margin determination that if dumping margins have declined and imports have remained steady or increased. Yes. And it's that part of the equation that we seem to be, or that part of the test, that we seem to be having some difficulty discerning how commerce got to where it got to. I understand the question, Your Honor. I still would argue that it's reasonably discernible through the statistics provided in the appendix. Any in particular? Again, Your Honor, just the… It's rather helpful to say, somewhere in the appendix. Go hunt for it. No, Your Honor. The specific producer information at appendix pages 191 through 197. And they prove what, in your view? They show, under the Commerce Department's interpretation of the statistics, that they remained steady or were increasing during the period. Yeah, yeah, yeah. But the questions are whether those conclusions about steadiness are completely belied by the numbers that aren't in dispute. Your Honor, all I can point to is that the evidence the Commerce Department relied upon, which is attached to the final determination. But you're defending the view that the fluctuation in those numbers comports with the finding that they were steady across a five-year period? That was the Commerce Department's interpretation. Well, of course we know that's the interpretation. That's what's before us to review whether that interpretation is rational, whether it's supportable by the numbers that aren't disputable. That's correct, Your Honor. However, I mean, it's like discerning a trend in movements in the stock market. There is some element of discretion in the interpretation of the numbers. Yeah, but if the numbers jump up and down by large percentages from one year to the next, you can't make that a steady trend by just attaching the label and saying, we choose to call it a steady trend. It may change up and down 50 percent from one year to another. But to us, that steady, that's just making that word nonsensical. And it does seem hard... ...to judge more. Which... I mean, there may very well be an answer here. But it doesn't seem that either you or any of us have it in terms of how commerce got to the conclusion it reached on the way volume went. We're all having a problem figuring it out. Yes, Your Honor. It seems. Did you argue this case in front of Judge Waller? Yes, I did, Your Honor. Why didn't you just remand it then and save us all a year? When the numbers don't add up, the government ought to take a reasonable position and send it back and have commerce fix it. Otherwise, you just waste everybody's time. They waste everybody's money, not to exclude the taxpayers. Trying to defend what looks numerically indefensible. You don't have to answer the question. I suppose the real answer is somebody at a higher level might not have consented. So they weren't asked, or they were asked and said, no, you can't remand it voluntarily. In any event, we appreciate your position. We understand what it is. Now, we have two brief rebuttals. Thank you, Mr. D'Alessandro. Ms. Callejo, I guess you go first for two minutes. Thank you, Your Honor. I would just like to make a point about what was just discussed. Specifically, the data about the company-specific import volumes is a part of the confidential records, so we'd just like to note that we may ask for the audio file to be restricted in this case because there are members of this audience and the general public that are not subject to the APO. I'm not dealing with that here and now. You can ask for anything you want post-argument. You've got to do it very carefully and in writing. That raises an interesting question. How can a meaningful decision be written by this court either way on this margin issue? I mean, you know, we have to explain our decision whether we affirm on the margin issue or send it back, as has been suggested. How can one write a decision that explains what we're doing without talking about the figures? Well, at least with respect to the decisions of the Court of International Trade, it typically, in such a case, would issue a confidential opinion and then a public opinion that redacts the information that is subject to APO. So I believe that that is an option available to this court as well. Otherwise, it may be possible to speak in generalities, although I understand that it's obviously not ideal. But I think there is that option. I imagine if we spoke in percentages rather than wrong numbers, it wouldn't cause a problem for your clients, right? If I said that from year one to year two it decreased by 52 percent, from year three to year four it decreased by 42 percent, as opposed to 127 to 242 or whatever. I think that would be okay, but I would want to take a look at the record and discuss internally to make sure that that wouldn't reveal any company-specific data. Which company do you represent? We represent JTEC Corporation or COYO as it was known during the review. Anything further? I think we will rest on our previous statement and just request that the court remand the portion of the determination related to the likelihood of continuing or recurring dumping. Thank you. Thank you. Mr. Salonen? Yeah, just a brief word on the likelihood issue. Skyazza was speaking about the value numbers. If you turn to page 169 of the joint appendix, and this was data that was submitted by Torrington or Timken as part of its substantive response and was attached to the Commerce Department's preliminary results, that is looking at the imports by value. What that shows is that although import values were, in absolute terms, were higher as a share of apparent consumption in the U.S., they were lower. I'm sorry, I lost you. Where am I looking? Page 169 of the appendix. 169. You'll see there, these are public numbers. In 1988, the year before the investigation of the order went into effect, total Japanese apparent consumption of ball bearings in the U.S. was 16.5% by value. It didn't approach that. In fact, for most of the period subsequent during the sunset review period, it was about half that. So that on a value basis, when you look at it by market share, what the Commerce Department found was also supported by the record. All right. I thank all three counsel. We'll take the appeal under advice.